NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS BIONDOLILLO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROCHE HOLDING AG, SEVERIN SCHWAN, ALAN HIPPE, DANIEL O'DAY, and GOTTLIEB A. KELLER,<br><br>Defendants. | Civ. No. 17-4056<br><br>**OPINION** |

THOMPSON, U.S.D.J.

## **INTRODUCTION**

This matter comes before the Court upon the Motion to Dismiss filed by Defendants Roche Holding AG ("Roche"), Severin Schwan, Alan Hippe, Daniel O'Day, and Gottlieb A. Keller (collectively, "Defendants"). (ECF No. 31). Plaintiff Thomas Biondolillo, on behalf of a putative class, opposes, and in the alternative requests leave to amend (ECF No. 32). The Court has decided the Motion on the written submissions of the parties, pursuant to Local Rule 78.1(b). For the reasons stated herein, Defendants' Motion to Dismiss is granted, and Plaintiff is granted leave to amend the operative complaint

## **BACKGROUND**

This class action, brought on behalf of purchasers of certain securities in Roche, arises from allegations that Defendants made false and misleading statements about the results of a breast cancer treatment study, artificially inflating Roche's stock price. In addition to suing Roche itself, Plaintiff brings claims against Severin Schwan, CEO; Dr. Alan Hippe, Chief

1

Financial & IT Officer; Daniel O'Day, CEO of Roche Pharmaceuticals; and Gottlieb A. Keller, Roche's General Counsel (collectively, "Individual Defendants"). (Am. Compl. ¶¶ 27–30, ECF No. 24.) All four Individual Defendants are members of Roche's six-member Corporate Executive Committee, which is Roche's chief operating decision maker. (*Id.* ¶¶ 33–34.)

Roche is a biotechnology company whose valuation derives primarily from its business manufacturing cancer medicines. (*Id.* ¶ 40.) The company's second-highest-grossing product is Herceptin, a drug used to treat HER2-positive breast cancer, which accounted for 13.2% of Roche's total sales in 2017. (*Id.* ¶¶ 41–42.) Since Herceptin's introduction in 1998, the drug has dominated the market; but that dominance is threatened by the expiration of its patent in both the European Union (in 2014) and the United States (in 2019), and by competition from biosimilars (drugs with similar active properties). (*Id.* ¶¶ 45–46, 50–51.)

In an effort to protect Herceptin from biosimilar competition, Roche and several other organizations conducted the APHINITY Phase III Study ("APHINITY") to test the effects of Herceptin with another drug, Perjeta. (*Id.* ¶¶ 57, 61.) Perjeta is one of Roche's newer breast cancer medications, and is approved for use in combination with Herceptin and chemotherapy in the neoadjuvant (pre-surgery) setting. (*Id.* ¶ 58) The APHINITY study would determine whether this same combination—Perjeta, Herceptin, and chemotherapy ("the Perjeta-based regimen")— improves patient outcomes in the adjuvant (post-surgery) setting. (*Id.* ¶ 61.) As the Amended Complaint describes it:

> If Roche could show that Perjeta, which would be protected by a Roche patent against competition for at least another 15 years, provided a clinically significant benefit when administered after surgery [i.e., adjuvant], not only would an increase in revenues from Perjeta offset revenue losses from Herceptin biosimilar competition, the sales life of Herceptin would also be extended, protecting billions in Roche revenue. Because Perjeta would only be used in combination with Herceptin, Roche would be able to offer a Herceptin-Perjeta bundle at a discount to a combination of Perjeta and a biosimilar competitor.

2

(*Id.* ¶ 60.) APHINITY results were therefore hotly anticipated and widely discussed by analysts and investors. (*Id.* ¶¶ 54, 57, 64, 67.) Before any results were released, analysts at both J.P. Morgan and UBS concluded that a 20% improvement in disease-free survival in the overall patient population would constitute a "positive" outcome. (*Id.* ¶¶ 69–70.)

The full results of APHINITY would not be released until the annual American Society of Clinical Oncology (ASCO) meeting in June 2017. (*Id.* ¶ 63.) But on March 2, 2017, Roche issued a press release announcing the study's purported top-line results:

> Phase III APHINITY study shows Roche's Perjeta® regimen helped people with an aggressive type of early breast cancer live longer without their disease returning compared to Herceptin® and chemotherapy[.]
>
> Perjeta plus Herceptin and chemotherapy showed a statistically significant improvement in invasive disease-free survival (iDFS) for people with HER2-positive early breast cancer (eBC) compared to Herceptin and chemotherapy alone.
> . . . .
> Roche [and its partners in the study] today announced positive results from the phase III APHINITY study. The study met its primary endpoint and showed that adjuvant (after surgery) treatment with [the Perjeta-based regimen] achieved a statistically significant reduction in the risk of recurrence of invasive disease or death (invasive disease-free survival; iDFS) in people with HER2-positive early breast cancer (eBC) compared to Herceptin and chemotherapy alone. The safety profile of the Perjeta-based regimen was consistent with that seen in previous studies [footnote omitted], and no new safety signals were identified. Full results from the APHINITY trial will be presented at an upcoming medical meeting in 2017.

(*Id.* ¶ 75 (emphasis edited).) "Analysts and investors reacted to the press release with vigorous enthusiasm." (*Id.* ¶ 77–82.) On the day the press release was issued, Roche's share price rose by nearly 6%, its largest one-day increase in eight years. (*Id.* ¶ 76.)

During an April 27, 2017 conference call with investors, Defendant O'Day made the following statements concerning APHINITY:

> And with the APHINITY trial, . . . one medicine in combination has been able to *improve the standard of care systematically* across metastatic, neoadjuvant and now adjuvant. *APHINITY met its primary endpoint* of reducing the risk of

3

> recurrence of invasive disease or death compared to Herceptin and chemo alone. And this is really I think *terrific news for patients* because we're really talking about a *curative setting here with early breast cancer*. We are really looking forward to presenting the results to you at ACSO . . . . Based on the APHINITY results, . . . *we can absolutely be confident to continue to grow this franchise through the introduction of biosimilars*, which will start in Europe in the second half of this year.

(*Id.* ¶ 85 (emphasis edited).) In response to an analyst's question about the robustness of the APHINITY results and projected sales of Perjeta and Herceptin, O'Day responded:

> [W]e have to really wait until ASCO to get into the details. But suffice it to say that we think this is the data we filed, where *we think the data shows a reduction in risk recurrence in invasive breast cancer* and *we think they're clinically meaningful*. I think that's about as much as I'm going to open the envelope on today until you see the additional data.

(*Id.* ¶¶ 86–87) (emphasis edited).)

On June 5, the full results were revealed. (*Id.* ¶ 106.) The study found a 19% improvement in rates of disease-free survival. (Mot. Dismiss, Ex. G at 1, ECF No. 31-9.) "At three years, 94.1% of people treated with the Perjeta-based regimen did not have their breast cancer return compared with 93.2% treated with Herceptin and chemotherapy." (*Id.* ¶ 107.) APHINITY met its endpoint and achieved statistical significance (*id.* ¶ 127), but its p-value was .045, within only a "hair" of statistical significance (*id.* ¶ 109). The entire improvement discovered was attributable to one subgroup within the trial—patients with lymph node-positive status. (*Id.* ¶ 110.) The study also found that the Perjeta-based regimen increased the incidence of three safety signals: diarrhea (58% increase), primary cardiac events (113% increase), and Class III or IV heart failure (150% increase). (*Id.* ¶ 111.) The rate of discontinuation due to adverse events was also 1.1 percentage points higher for participants on the Perjeta-based regimen. (*Id.*)

The day the full results were released, Roche's share price fell 5.12%. (*Id.* ¶ 112). This wiped out prior gains from the March 2 press release. (*Id.*) Several analysts and oncologists found the results disappointing. (*Id.* ¶¶ 113–24.) Doctors stated that the Perjeta-based regimen

4

did not improve overall survival, lamented its associated safety signals, and concluded that adding it to oncologists' standard regimens would be premature. (*Id.* ¶¶ 118–20.)

Between March 3, 2017 (one day after the press release) and May 10, 2017 (about one month before the ASCO meeting), the Individual Defendants sold Roche securities totaling approximately $7.1 million. (*Id.* ¶ 101.) Members of the Corporate Executive Committee also executed six other sales, totaling approximately $5.3 million, during this period. (*Id.* ¶¶ 101–03.) While individual Defendants constitute four of the six members of this Committee, it is unknown which members made the remaining $5.3 million in trades. (*Id.* ¶¶ 34, 103.)

Plaintiff filed an Amended Complaint on March 5, 2018, on behalf of all persons who purchased Roche ADS shares between March 2, 2017 and June 5, 2017. (*Id.* ¶¶ 1, 137.) The Amended Complaint alleges that all Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (*Id.* ¶¶ 143–52); and that Individual Defendants violated Sections 20(a) and 20A of the Securities Exchange Act, 15 U.S.C. §§ 78t(a), 78t-1 (*Id.* ¶¶ 153–67). Following the timeline set by a Stipulation and Consent Order (ECF No. 30), Defendants moved to dismiss on June 4, 2018 (ECF No. 31).[1] On July 19, 2018, Plaintiff opposed the Motion and in the alternative sought leave to amend (ECF No. 32). Defendants replied on August 20 (ECF No. 33).[2] This Motion is presently before the Court.

## **LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). The defendant bears the

---

[1] Defendants requested oral argument on this Motion, but the Court has decided the Motion on the papers pursuant to Local Rule 78.1(b).
[2] Plaintiff also moves to strike an exhibit included with Defendant's Reply. (ECF No. 34.) The Court did not consider the contents of this Exhibit in deciding the present Motion to Dismiss. The underlying Motion to Dismiss having been decided, the Court dismisses as moot Plaintiff's Motion to Strike.

burden of showing that no claim has been presented. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). When considering a Rule 12(b)(6) motion, a district court should conduct a three-part analysis. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must "review[] the complaint to strike conclusory allegations." *Id.*; *see also Iqbal*, 556 U.S. at 679. Finally, the court must assume the veracity of all well-pleaded factual allegations and "determine whether the facts are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (quoting *Iqbal*, 556 U.S. at 679); *see also Malleus*, 641 F.3d at 563. If the complaint does not demonstrate more than a "mere possibility of misconduct," it must be dismissed. *See Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).

Additionally, in a securities case, the Private Securities Litigation Reform Act ("PSLRA") imposes a more demanding pleading standard. To allege a false or misleading statement or omission, the complaint must, "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). This is effectively the same pleading standard as provided by Federal Rule of Civil Procedure 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud." *Inst. Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

Additionally, the PSLRA requires that a complaint alleging scienter "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2)(A). This requirement, more stringent than that provided by Rule 9(b),

*Avaya*, 564 F.3d at 253, makes a pleaded inference satisfactory "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). However, the inference need only be *as* compelling, not *more* compelling, than a competing inference, and need not rely on a "smoking-gun." *Id.* (internal citation omitted).

Although a district court generally must confine its review on a Rule 12(b)(6) motion to the pleadings, *see* Fed. R. Civ. P. 12(d), "a court may consider certain narrowly defined types of material" beyond the pleadings, *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999), including matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal citation omitted).

## **DISCUSSION**

### I. Section 10(b) and Rule 10b-5

All Defendants are alleged to have violated Section 10(b) and Rule 10b-5 by "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To establish this cause of action, Plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)); *accord City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). Defendants argue that Plaintiff has failed to sufficiently plead both (1) a material misrepresentation or omission and (2) scienter.

7

A. *Material Misrepresentation*

Determining whether statements were false or misleading requires a "full reading" of the statements and their context. *Pfizer*, 754 F.3d at 168. Accordingly, it will not do to take each statement one at a time and show the literal truth of each. *Walsingham v. Biocontrol Tech., Inc.*, 66 F. Supp. 2d 669, 676–77 (W.D. Pa. 1998). A company is never obliged to speak on an issue. *Pfizer*, 754 F.3d at 174. But, consistent with the "full reading" principle, once the company has put an issue "in play" by speaking on it, "it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (citing *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490–91 (3d Cir. 1994)). This prohibition on omissions of material fact has sometimes been described as a duty to disclose. *See Pfizer*, 754 F.3d at 174; *Kline*, 24 F.3d at 491.

Opinions qualify as false or misleading statements where the issuer of the opinion does not honestly believe the opinion or lacks a reasonable basis for believing it. *Pfizer*, 754 F.3d at 170 (internal citations omitted); *cf. Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1328–29 (2015) (requiring, in a Section 11 case, that an opinion "fairly align[] with the information in the issuer's possession at the time").

"[V]ague and general statements of optimism" are mere puffery and are not actionable. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999), *abrogated on other grounds by Tellabs*, 551 U.S. 308. This category includes "projections about the company's financial growth, or expressions of general optimism about its financial health." *Key Equity Investors, Inc. v. Sel-Leb Mktg., Inc.*, 246 F. App'x 780, 785 (3d Cir. 2007).

1. Roche's March 2 Press Release

The press release issued by Roche on March 2, 2017 announced "positive results," and also made the following specific claims about APHINITY: it found a "statistically significant

8

improvement in invasive disease-free survival," it "met its primary endpoint", "[t]he safety profile of the Perjeta-based regimen was consistent with that seen in previous studies," and "no new safety signals were identified." (Am. Compl. ¶ 75.) The press release also stated that full results would be announced at the ASCO meeting, but made no other warning that the announced headline results should be discounted. (*Id.*)

Of the specific claims made, the study did find a statistically significant improvement in disease-free survival, and the study did meet its primary endpoint. (*Id.* ¶ 127.) The press release's statements concerning safety signals were also accurate.[3]

Likewise, the press release taken as a whole is not misleading. The press release called the APHINITY results "positive," but such interpretations of trial data are matters of opinion, *Pfizer*, 754 F.3d at 170 (citing *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013); *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 567 (E.D. Pa. 2009)), and the Amended Complaint offers no evidence that this opinion lacked a reasonable basis.

Indeed, it is not clear what exactly was misleading about the press release, or what information Roche should have disclosed to make it not misleading. Outside analysts had speculated that a "positive" result would mean a 20% improvement in disease-free survival. (Am. Compl. ¶¶ 69–70.) It was later revealed that APHINITY found a 19% improvement. (*Id.* ¶ 106.) And while Roche could have disclosed that the positive results were driven by one subgroup, Plaintiff has failed to demonstrate why such a disclosure would have made the press

---

[3] Previous studies found that Perjeta increased the incidence of diarrhea by between 18% and 82%, and that it increased the incidence of left ventricular dysfunction by between -23% and 294%. (Mot. Dismiss, Ex. E at 10, 12, ECF No. 31-7.) APHINITY found the incidence of diarrhea increased by 58%, of primary cardiac events by 113%, and of Class III or IV heart failure by 150%. (Am. Compl. ¶ 111.) APHINITY's results can thus be fairly described as consistent with the results of previous studies.

9

release meaningfully different.[4] The press release was therefore not false or misleading.

### 2. O'Day's Remarks During the April 27 Conference Call

During the April 27, 2017 call, O'Day repeated the press release claims that APHINITY met its primary endpoint and that the data shows a reduction in risk recurrence. (Am. Compl. ¶¶ 85–87.) In addition, he called the APHINITY results "terrific news for patients" and said that the results show that the Perjeta-based regimen can "improve the standard of care systematically" and provides "a curative setting . . . with early breast cancer." (*Id.* ¶ 85.) He also stated, when asked about the robustness of the APHINITY results, "we think this is the data we filed, where . . . we think they're clinically meaningful." (*Id.* ¶ 87.)

His claims—specifically his claims that the Perjeta-based regimen can "improve the standard of care systematically" and that the APHINITY data are clinically meaningful—were later doubted by analysts and medical professionals. (*Id.* ¶¶ 113–24.) But his statements are still, like those made in the press release, interpretations of a clinical trial and matters of opinion. *Pfizer*, 754 F.3d at 170 (internal citations omitted). That O'Day's statements were opinions is shown by an expert's remark that, "A determination of clinical significance is necessarily more nuanced than the hard numbers that determine statistical significance." (Am. Compl. ¶ 118.) And Plaintiff does not show that O'Day did not honestly believe these opinions or lacked a reasonable basis for them. Moreover, to the extent that O'Day's statements expressed general optimism about what the APHINITY results meant for the future of the company, they constitute

---

[4] This case is distinguishable from *In re PTC Therapeutics, Inc. Securities Litigation*, where a pharmaceutical company was found to have made false or misleading statements when it claimed that drug trial results were "clinically meaningful," while in reality the study found clinically meaningful results in only one subgroup. 2017 WL 3705801, at *13–15 (D.N.J. Aug. 28, 2017). In *PTC Therapeutics*, there was no statistically significant effect for the study population as a whole, and the company used a post-hoc statistical analysis, which it had failed to disclose, to find significance in one subgroup. *Id.* at *4, *14. Here, by contrast, APHINITY found statistical significance for the entire study population.

inactionable puffery. *See Advanta*, 180 F.3d at 538 (calling "vague and general statements of optimism" puffery). O'Day therefore did not make false or misleading statements during the conference call.

    B.    *Scienter*

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," *Matrixx*, 563 U.S. at 48 (citing *Tellabs*, 551 U.S. at 319), encompassing reckless or conscious behavior, *Avaya*, 564 F.3d at 267. As stated above, a complaint must establish an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23 (italics in original) (internal citations omitted).

A defendant's planned statement or repeated answers to questions on a topic are enough to infer scienter. *Matrixx*, 563 U.S. at 49; *Avaya*, 564 F.3d at 267. Scienter may also be inferred where a defendant attended meetings about and was otherwise seriously involved with the subject matter of her statements. *See, e.g., In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014). While an officer's sale of stock is not enough to infer scienter, stock sales that are "unusual in scope or timing . . . may support an inference of scienter." *Avaya*, 564 F.3d at 279 (internal citations omitted).

The Third Circuit has rejected the "group pleading doctrine[,] a judicial presumption that statements in group-published documents including . . . press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations." *Winer Family Trust v. Queen*, 503 F.3d 319, 335–37 (3d Cir. 2007); *see also Advanta*, 180 F.3d at 539 ("Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company." (internal citation omitted)). Rather, the complaint must

specifically plead scienter for each defendant. *Id.* at 337.[5]

Here, the Amended Complaint adequately pleads scienter for Defendants Roche and O'Day. Roche, as co-author of the press release, and O'Day, as issuer of statements during the conference call, are impliedly conscious of, or reckless in regard to, the allegedly false content contained in their respective statements. But Plaintiff fails to infer scienter for the three remaining Individual Defendants: Schwan, Hippe, and Keller. Their senior positions at Roche are insufficient, as the Third Circuit does not apply the group pleading doctrine. The Amended Complaint makes no allegations specifically tying these Defendants to the drafting of the press release or any meetings related to the APHINITY study. While these Defendants did sell stock between the March press release and the June ASCO meeting, Plaintiff does not show how these sales were "unusual in scope or timing." *Avaya*, 564 F.3d at 279 (internal citations omitted).[6] Finally, Plaintiff's conclusory statements that these Defendants had "personal knowledge" of the APHINITY results (Am. Compl. ¶¶ 27–30) do not comply with the PSLRA's demand that facts supporting an inference of scienter be "state[d] with particularity," 15 U.S.C. § 78u-4(b)(2)(A).

Because of the Amended Complaint's defects regarding both false and misleading statements and scienter, Defendants' Motion to Dismiss must be granted as to the Section 10(b) and Rule 10b-5 claims.

---

[5] After briefing on this Motion was completed, the Third Circuit further expounded upon the requirements for pleading a strong inference of scienter in *In re: Hertz Global Holdings Inc.*, 2018 WL 4496352, No. 17-2200 (3d Cir. Sept. 20, 2018). *Hertz* does not significantly alter the law as it applies to this case, and this Court's holding today is consistent with the reasoning of *Hertz* to the extent that it is relevant.

[6] Defendants' sales during the relevant period constituted 8.5% of their total equity holdings in Roche. (Mot. Dismiss at 38.) The Amended Complaint does not clarify whether 8.5% is a lot or a little. Plaintiff also has not shown whether Individual Defendants sold stock in a similar pattern before or after this time period.

## II. Section 20(a)

Section 20(a) of the Securities Exchange Act states that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Liability under Section 20(a) "is derivative of an underlying violation of Section 10(b) by the controlled person." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013) (quoting *Avaya*, 564 F.3d at 252). Thus, where no Section 10(b) violation has been successfully pled, a Section 20(a) violation must fail as well. *Id.* The Amended Complaint must therefore be dismissed with regard to Section 20(a).

## III. Section 20A

Section 20A of the Securities Exchange Act provides:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class.

15 U.S.C. § 78t-1(a). Liability under Section 20A, like Section 20(a), requires an underlying violation of Section 10(b). *Pfizer*, 754 F.3d at 175 (citing *Advanta*, 180 F.3d at 541). Because Plaintiff has failed to state a claim under Section 10(b), he has likewise failed to state a Section 20A claim, *id.* at 175–76, and the Amended Complaint must be dismissed with regard to Section 20A.

## IV. Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) allows amendment of the pleadings with the court's leave, which should be given freely. *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000). Plaintiff is therefore granted leave to file an amended complaint addressing the deficiencies

13

discussed above, in accordance with Local Civil Rule 15.1(b).

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss is granted, and Plaintiff is granted leave to amend the Amended Complaint. An appropriate order will follow.

Date:  9/24/18  */s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.